No. 22-4125

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

## UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

## KEVIN NEAL SMITH,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Eastern District of Virginia (No. 1:20-cr-0074-AJT)

---

## BRIEF FOR APPELLANT

---

Jonathan S. Jeffress
Tony W. Miles
Amelia Schmidt
William Zapf
KAISERDILLON PLLC
1099 14th Street NW, 8th Floor
Washington, D.C. 20005
Telephone: (202) 640-2850
Facsimile: (202) 280-1034
jjeffress@kaiserdillon.com

*Counsel for Appellant*

## TABLE OF CONTENTS

JURISDICTION ................................................................................. 1

ISSUES PRESENTED ........................................................................ 1

INTRODUCTION ............................................................................... 1

STATEMENT OF THE CASE ............................................................ 4

    I.   THE TRIAL EVIDENCE. ....................................................... 5

        A.  SDB's History ............................................................. 5

        B.  Michael Myers's efforts to deceive others regarding SDB's WOSB status ................................................................. 6

        C.  Mr. Myers misleads Mr. Smith regarding SDB's woman-owned small business status during his job interview ...................................... 7

        D.  Mr. Smith is led to believe from his start date by Mr. Eldredge and others that SDB is a WOSB ................................................................. 8

        E.  Mr. Myers continues to mislead Mr. Smith and although Mr. Eldredge briefly questions SDB's WOSB status in his May 14, 2014 email Mr. Eldredge does not follow up or believe that SDB is committing fraud .............................................. 9

        F.  Mr. Smith's consistent communications made to or intended for outside third parties—including U.S. prime contractors—that Mr. Myers controlled SDB ......................................... 13

            1. The May 30, 2014 business plan ……………………………....13

            2. Mr. Smith's June 4, 2014, meeting with Patricia Overway ……... 14

            3. The capabilities statement ……...……………………………...17

            4. Mr. Smith's revisions to SDB's website - and Mr. Myers's continued efforts to deceive him ……………………………………………... 18

        G.  Mr. Smith's certification of SDB as a woman-owned small business in the System for Award Management after meeting with Anne Robins at USA headquarters ......................................... 20

        H.  The sale of Ms. Robins's ownership interest and Mr. Myers's concealment of the sale from Mr. Smith and other SDB employees as they were preparing a bid for Jacobs Technology ........................... 21

I.   Mr. Myers continues to mislead Mr. Smith regarding Ms. Robins's role and the WOSB issue ...................................................... 23

J.   Mr. Smith's interviews with law enforcement and Mr. Myers's attempt to obstruct justice ................................................. 24

II.  THE ADMISSION OF MR. ELDREDGE'S STATEMENT OF FACTS ........................................................................................ 25

III. THE POST-TRIAL PROCEEDINGS........................................................ 30

SUMMARY OF ARGUMENT .................................................................. 31

STANDARD OF REVIEW…………………………………………………31

ARGUMENT…………………………….…………………………………32

I.   THE COURT SHOULD ORDER A NEW TRIAL BASED ON THE ERRONEOUS ADMISSION OF MR. ELDREDGE'S HIGHLY PREJUDICIAL STATEMENT OF FACTS……..………………32

A.   The admission of Paragraphs 1 and 2 from Mr. Eldredge's statement of facts violated Federal Rule of Evidence 801................... 32

   1. The defense did not cross-examine Mr. Eldredge regarding statements from his statement of facts - or any other prior statements…………………………………………………....33

   2. Mr. Eldredge adopted the statement of facts at a time when he had a motive to fabricate - a fact the defense had no opportunity to cross-examine him about……………………………………………..34

B.   The statements were not admissible for rehabilitation under the rule of completeness....................................................................... 36

   1. The defense never sought to discredit Mr. Eldredge with any prior statement…………………………………………………………38

   2. The defense never questioned Mr. Eldredge about his statement of facts…………………………………………………………39

   3. The incriminating statements in the statement of facts went well beyond Mr. Eldredge's testimony from direct examination………...40

   4. The rule of completeness does not permit the introduction of prior statements for the truth of the matters asserted therein…………...41

C. The erroneous admission of the statement of facts was highly prejudicial. ........................................................................ 43

II. THE EVIDENCE OF INTENT WAS LEGALLY INSUFFICIENT……………………………………………………45

A. The government never accounted for the overwhelming evidence that Mr. Myers lied to Mr. Smith repeatedly about the WOSB requirements and Ms. Robins's ownership of SDB……………………………………...47

B. The government did not meaningfully challenge Mr. Smith's testimony……………………………………………………………...49

C. The government never accounted for the evidence - including the testimony of its own witness, Patricia Overway - that Mr. Smith consistently communicated to third parties that Mr. Myers controlled SDB……………………………………………………………...51

CONCLUSION…………………………………………………….…..53

STATEMENT REGARDING ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Beech Aircraft Corp. v. Rainey*,
    488 U.S. 153, 172 (1988) ................................................................. 39

*Schoppel v. United States*,
    270 F.2d 413, 417 (4th Cir. 1959) ................................................... 38

*Tome v. United States*,
    513 U.S. 150, 157 (1995) ..................................................... 32, 34, 37

*United States v. Allen*,
    69 F. App'x 602, 604 (4th Cir. 2003) .............................................. 41

*United States v. Awon*,
    135 F.3d 96, 101 (1st Cir. 1998) ............................................... 39, 44

*United States v. Bolick*,
    917 F.2d 135, 138 (4th Cir. 1990) ......................................... 41, 43, 44

*United States v. Bonner*,
    648 F.3d 209, 213 (4th Cir. 2011) ................................................... 46

*United States v. Burfoot*,
    899 F.3d 326, 334 (4th Cir. 2018) ................................................... 31

*United States v. Chukwuezi*,
    No. 98-4129, 1999 WL 147934, at *2 n.1 (4th Cir. Mar. 18, 1999) ............... 42

*United States v. Ellis*,
    121 F.3d 908, 919 (4th Cir. 1997) ............................................... 35, 38

*United States v. Henderson*,
    717 F.2d 135, 138 (4th Cir. 1983) ......................................... 33, 34, 35

*United States v. Landersman*,
    886 F.3d 393, 413 (4th Cir. 2018) ................................................... 31

*United States v. Lowe*,
    65 F.3d 1137, 1144 (4th Cir. 1995) ................................................. 33

*United States v. Mazza*,
    792 F.2d 1210, 1215 (1st Cir. 1986) ............................................... 44

*United States v. Weil*,
    561 F.2d 1109, 1111 n.2 (4th Cir. 1977) ....................................... 34, 35

*United States v. Zelaya*,
    908 F.3d 920, 925 (4th Cir. 2018) ................................................... 31

## Statutes

18 U.S.C. § 1343 ............................................................................ 4

18 U.S.C. § 1349 ............................................................................ 4

18 U.S.C. § 3231 ................................................................................ 1

28 U.S.C. § 1291 ................................................................................ 1

## Rules

Federal Rule of Criminal Procedure 29 .............................................. 1

Federal Rules of Evidence 801 and 802 ............................................. 1

Federal Rule of Evidence 801 ................................................... 3, 32, 34

Federal Rule of Evidence 801(a) .................................................... 33

Federal Rule of Evidence 801(d) ............................................... 27, 33

Federal Rule of Evidence 801(d)(1)(B)........ 3, 27, 30, 32, 33, 34, 36, 37, 40, 42, 54

U.S.S.G. § 5K1.1………………………………………………………………35

## Other Authorities

Floralynn Einesman, *Using Prior Consistent Statements to Rehabilitate Credibility or to Prove Substantive Assertions Before and After the 2014 Amendment of Federal Rule of Evidence 801(d)(1)(B)*, 41 Am. J. Trial Advoc. 1 (2017) ....... 34

Laird C. Kirkpatrick and Christopher B. Mueller, *The Dangers of Misinterpreting the Recently Amended FRE 801(d)(1)(B),* 84 Geo. Wash. L. Rev. Arguendo 192, 195-196 (2016) …………………………………………………..40

## JURISDICTION

The district court had jurisdiction under 18 U.S.C. § 3231. This Court's jurisdiction rests on 28 U.S.C. § 1291. The district court entered judgment on February 9, 2022. Mr. Smith timely appealed the judgment on February 22, 2022.

## ISSUES PRESENTED

1.    Whether the district court erred by allowing impermissible hearsay testimony, in violation of Federal Rules of Evidence 801 and 802, when it permitted the government to introduce—on redirect examination of its key cooperating witness—portions of the statement of facts from the witness's plea agreement stating, *inter alia*, that the witness "knew" Mr. Smith had conspired to and did commit wire fraud.

2.    Whether the district court erred by denying Mr. Smith's motion for judgment of acquittal on all counts under Federal Rule of Criminal Procedure 29 based on the insufficiency of the evidence.

## INTRODUCTION

Kevin Smith was wrongfully convicted. The jury convicted Mr. Smith of fraud for representing to the U.S. government and prime contractors that his former employer, SDB Engineers and Constructors, Inc. ("SDB"), a government subcontractor, was a woman-owned small business and therefore eligible for certain set-aside contracts under the Federal Acquisition Regulations ("FAR").

1

Those representations were not accurate—SDB did not qualify as a woman owned-small business ("WOSB") under the FAR.  The critical issue at trial was whether Mr. Smith *understood* that SDB did not qualify when he certified the company as woman-owned.  He plainly did not, and the evidence on the essential element of his fraudulent intent was insufficient as a matter of law.

From SDB's founding in 1994 until August 2014, Anne Robins, a woman, was the majority owner of SDB.  But she did not control SDB; the company's founder, Larry Myers, and later his son, Michael Myers, did.  Because the FAR requires that a woman have majority ownership *and* control the business to qualify for the FAR set-aside, SDB was not a legitimate woman-owned small business.

The question at trial was whether Mr. Smith fully understood the FAR's two-part definition and nonetheless certified the company as a WOSB.  While the prosecution pointed to the language reflecting the FAR's requirements in the certifications Mr. Smith completed, there was strong evidence that Mr. Smith did not accurately understand the requirements.  That evidence included Mr. Smith's frequent representations to outside third parties—including in communications he prepared for prime contractors—that CEO Michael Myers, a man, controlled the company.  It also included the undisputed evidence that Mr. Myers (1) deliberately misled Mr. Smith regarding the FAR's requirement that a woman both own and control a WOSB; and (2) concealed from Mr. Smith that Ms. Robins had sold her

2

shares to Mr. Myers and his brother in August 2014, even though he knew that Mr. Smith was in the process of certifying SDB as a WOSB to a prime contractor. This evidence was fundamentally inconsistent with Mr. Smith's guilt. And yet, the government never even attempted to account for any of it, either at trial or in post-trial litigation.

Mr. Myers pled guilty to conspiring with Mr. Smith to commit fraud in this case under a cooperation agreement. The government nevertheless declined to call him as a witness at trial, instead making its star witness SDB's Chief Operating Officer, Henry Gifford ("Giff") Eldredge, who had pled guilty to misprision of a felony. When Mr. Eldredge's testimony proved more helpful than harmful to Mr. Smith's defense, the trial court permitted the government to introduce on redirect examination—over a defense objection—the government-drafted statement of facts Mr. Eldredge had signed as part of his cooperation plea agreement, years after the events in question. While the government argued that the statement of facts met the requirements of Federal Rule of Evidence 801(d)(1)(B), as a prior consistent statement, the statements in that document were neither (1) the subject of cross-examination; nor (2) made prior to Mr. Eldredge having a motive to fabricate his testimony. Nor did they qualify for admission under "the rule of completeness," an alternative theory the government adopted in its post-trial briefing.

The erroneous admission of the hearsay from Mr. Eldredge's statement of facts fundamentally altered the course of the trial. Mr. Eldredge's testimony had been neutral or even exculpatory of Mr. Smith prior to that point; the government should not have been permitted to substitute Mr. Eldredge's statement of facts on re-direct examination for testimony Mr. Eldredge had been unwilling to give prior to that time.

Even with the admission of Mr. Eldredge's statement of facts, the evidence was insufficient as a matter of law. But in the event the Court declines to direct judgment for Mr. Smith on his sufficiency claim, the erroneous admission of Mr. Eldredge's statement of facts was clear reversible error and requires a new trial.

## STATEMENT OF THE CASE

On August 3, 2021, following a jury trial, Mr. Smith was convicted of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349 (Count 1), and wire fraud, in violation of 18 U.S.C. § 1343 (Counts 2 and 4-7).[1] The indictment alleged that, between March 2014 and June 2015, Mr. Smith and others misrepresented to the U.S. government and to two prime government contractors that SDB was a woman-owned small business for the purpose of obtaining U.S. government subcontracts. J.A.0024-34. Count 2 of the indictment was based on a

---

[1] The jury acquitted Mr. Smith of the wire fraud charge alleged in Count 3.

prime contractor logging into the federal government's contracting system, the System for Award Management, in which Mr. Smith had certified SDB as a WOSB, to verify SDB's status before it was awarded a subcontract.  J.A.0032. Each of the remaining wire fraud violations alleged in counts 3-7 of the indictment was based on a separate payment from one of those prime contractors.  J.A.0032-33.

## I.    THE TRIAL EVIDENCE

### A.    SDB's History

The scheme that Mr. Smith was alleged to have joined in 2014 began two decades prior to his employment at SDB.  Larry Myers founded SDB in 1994 for the purpose of obtaining and performing on government contracts, including woman-owned small business set-aside contracts.  J.A.0250-51.  Anne Robins, SDB's President, owned 51 percent of the company, and Larry Myers owned 49 percent.  J.A.0250.  Ms. Robins worked for SDB until April 2013, when she retired but retained her ownership interest in the company and remained on the board of directors.  J.A.0257.

During her time with SDB, Ms. Robins was involved in some aspects of SDB's management.  She never ran the day-to-day operations of the company or controlled its decision-making.  Larry Myers performed these duties until he became ill in 2011 and his son, Michael Myers, took control of the company.

J.A.0250-51.  Nevertheless, throughout the company's 20-year existence, a long series of SDB employees signed representations and certifications to the U.S. government and prime contractors that SDB was a woman-owned small business[2]—the same representations and certifications Mr. Smith would be asked to sign when he began working at the company in 2014.

### B.    Michael Myers's efforts to deceive others regarding SDB's WOSB status

Mr. Myers's efforts to mislead others regarding SDB's woman-owned status, including his own employees, began well before Mr. Smith started working at the company.

In 2012, Mr. Myers hired Mr. Eldredge as Chief Operating Officer. J.A.0433-34.  Either during Mr. Eldredge's job interview or shortly thereafter, Mr. Myers told Mr. Eldredge that SDB could self-certify as a woman-owned small business so long as Ms. Robins owned 51 percent of the company.  J.A.0438-39. Mr. Eldredge believed him, even though he had prior experience working with set aside contracts for woman-owned businesses.  J.A.0439.

Michael Myers's efforts intensified in 2013, when he committed bank fraud to renew a $350,000 line of credit from SDB's lender, National Penn Bank. J.A.1774-80.  Prior to issuing the loan, SDB's banker, Ed Kittrell, raised questions

---

[2] These SDB employees included John Albert, Sabrina Kidd, and others.  J.A.0556.

regarding how Ms. Robins's April 2013 retirement would affect SDB's woman-owned small business contracts.  Mr. Myers responded—falsely—that SDB's government contracts were based on its "small business" size, not on its ownership by a woman.  J.A.1779.[3]  Mr. Myers also mischaracterized the FAR's requirements, assuring Mr. Kittrell that, because Ms. Robins "will remain 51 percent share-holder until I have paid for her shares," SDB would continue to be a woman-owned small business.  J.A.1779.  Several days later, based on Mr. Myers's misleading representations, the bank granted his request to renew the line of credit.  J.A.1781-82.

### C.    Mr. Myers misleads Mr. Smith regarding SDB's woman-owned small business status during his job interview

In December 2014, Mr. Smith interviewed to work at SDB.  In preparation for the interview, Mr. Smith reviewed SDB's website, which represented that the company was a woman-owned small business.  J.A.0908.  Seeing that, Mr. Smith asked Mr. Myers and Mr. Eldredge during the interview "whether SDB is still a [WOSB]."  J.A.0912; 1887.  Mr. Myers responded, "yes, SDB is still a [WOSB] until ownership transition to Mike/Mark Myers is completed."  J.A.0912; 1887.

---

[3] Mr. Myers similarly misled Mr. Eldredge about this issue by showing him a version of the QNA contract—SDB's largest prime contract—that did not have the "WOSB" box checked, which led Mr. Eldredge to believe that the QNA contract was a small-business contract and not a WOSB contract.  J.A.0459.

Based on the representations by Mr. Myers—the CEO of the company—Mr. Smith understood that (1) a woman (Ms. Robins) owned the company; (2) SDB was a woman-owned small business because of her ownership interest; and (3) when Ms. Robins sold her interest, SDB would no longer represent itself as WOSB, as it would no longer qualify under the applicable rules. J.A.0913; 1887. Following his interview, Mr. Myers and Mr. Eldredge offered Mr. Smith the General Manager position, which he accepted.[4]

### D.   Mr. Smith is led to believe from his start date by Mr. Eldredge and others that SDB is a WOSB

On Mr. Smith's first day at SDB, March 3, 2014, Mr. Eldredge sent him an organizational chart identifying Ms. Robins as President of SDB. J.A.1839. This was consistent in Mr. Smith's mind with what he had been told during his job interview about Ms. Robins owning 51 percent of the company. J.A.0919.

When Mr. Smith asked John Albert—a longtime SDB employee—for background on the company to help him prepare marketing materials, Mr. Albert supplied him with a narrative regarding the company that Mr. Smith believed and utilized for the duration of his tenure. J.A.0939. On April 9, 2014, Mr. Albert sent Mr. Smith an email which stated in part, "Larry Myers came down to look us over

---

[4] SDB hired Mr. Smith at a fixed salary of $100,000—a pay decrease from Mr. Smith's previous job. J.A.1895. Mr. Smith accepted SDB's offer in part to be closer to his family. J.A.1895-96.

and invested in our company.  We became SDB, *a self-certified Woman owned company* . . . Anne has owned 51% of the company from the beginning and Larry had 49%."  J.A.0937-38; 1882 (emphasis added).  This was one of several times Mr. Smith, during his first few months at the company, heard SDB described as a "self-certified" woman-owned small business.  As explained to Mr. Smith by Mr. Myers, Mr. Albert, and others, the "self-certified" representation "was based on ownership and that 51 percent or more had to be owned."  J.A.0938; 0956.

E.    **Mr. Myers continues to mislead Mr. Smith and, although Mr. Eldredge briefly questions SDB's WOSB status in his May 14, 2014 email, Mr. Eldredge does not follow up or believe that SDB is committing fraud**

On a conference call on May 13, 2014, Mr. Smith, Mr. Myers, and Mr. Eldredge discussed Mr. Smith's ongoing assignment of exploring other potential set-asides SDB could apply for once Anne Robins sold her ownership interest in SDB to Mr. Myers.  J.A.474; 0959-60.

The next morning, Mr. Myers emailed Mr. Smith and Mr. Eldredge, claiming that he had been "researching the WOSB certification process" and that SDB "can remain self-certified if" Mr. Myers's spouse were "made 51 percent shareholder."  J.A.1935.[5]  Mr. Myers continued, "As [Mr. Myers's spouse]

---

[5] Mr. Eldredge agreed during his testimony that Mr. Myers's email conveyed that SDB could still *legitimately* claim WOSB status for another three years based on self-certification. J.A.477 ("Q:  So [Mr. Myers is stating that] we've got three years.

working at the company is not an option, I will need to discuss plans to transition Anne Robins from president of SDB over the duration of the ownership transfer, which will take another three years." J.A.1935. At the bottom of his email, Mr. Myers attached a link to an American Bar Association ("ABA") article on woman-owned small businesses. *Id.* The ABA article was eight single-spaced pages and stated the requirements for a woman-owned small business on the fourth page. J.A.1917-24.

Mr. Smith responded to Mr. Myers shortly thereafter, "Agreed. The self-certification is our best option at this point."[6] J.A.1935. This was consistent with what Mr. Myers had told Mr. Eldredge and Mr. Smith from the time each began working at SDB, including at Mr. Smith's interview in December 2013: that SDB "can remain self-certified so long as [Anne Robins] is the owner." J.A.0482. In his email, Mr. Smith went on to discuss his research on other potential set-asides, which was his assigned task in this regard. J.A.0971-73; 0977.

Later that day, after reading the ABA article from the link from Mr. Myers's email, Mr. Eldredge responded, observing that it was the first time he had seen the

---

We can still legitimately claim we are a woman-owned small business for three years based on self-certification, correct? A: Yes.").

[6] A forensic examination prepared by a government expert—whom the government never called to testify at trial—showed that Mr. Smith opened the ABA article link only 17 minutes before responding to Mr. Myers's email and began typing his response no more than six minutes before sending it. J.A.1306.

concept of self-certification explained in this way.  J.A.1934; 0486.  After reviewing the article in full, Mr. Eldredge stated that, if he was understanding the article correctly, SDB was on "very thin ice" in representing itself as a WOSB.  *Id.*  His email also downplayed the significance of this issue for SDB, based on his misperception—a misperception from his communications with Mr. Myers—that SDB's contract with QNA was based on its small-business status only, and did not require woman ownership or control.  J.A.0538; 1934.

The government seized on Mr. Eldredge's "thin ice" language at trial to argue that Mr. Smith, too, must have known then that SDB was not a legitimate woman-owned small business.  J.A.1199.  But while Mr. Eldredge expressed concern in that email that SDB's competitors might challenge SDB's set-aside status in future contract bids, nothing in his email suggested SDB was acting illegally.  J.A.0488.  And Mr. Eldredge testified that, when he wrote that email, he did not think he or anyone at SDB was committing a crime:

> Q:  Did you think you were committing a crime from here on out?
>
> A:  No.
>
> Q:  You didn't think so?
>
> A:  ***I didn't think so, no.***

J.A.0489 (emphasis added).

Mr. Eldredge did not regard this issue as concerning and did not see the need for follow up.  J.A.0493-94.  Mr. Eldredge sent a single additional response four days later, on a Sunday, to address an entirely different aspect of the email, which did not concern SDB's woman-owned status.  J.A.1939; 0980.  And as Mr. Eldredge testified, he had forgotten about the email exchange entirely until search warrants were executed at SDB in July 2016, when Mr. Eldredge went back and searched his email for any relevant discussion of this issue.  J.A.0584 ("Q:  You had forgotten all about [the May 14, 2014] email, hadn't you?  A:  Yes.").

The government tried but failed to elicit testimony from Mr. Eldredge that the "thin ice" email exchange was the moment Mr. Smith joined a conspiracy with Mr. Myers—a conspiracy that Mr. Eldredge, according to the government, was somehow not guilty of participating in—to commit fraud.  The government asked Mr. Eldredge whether, "[b]ased on his subsequent words and actions," Mr. Smith had agreed to falsely represent SDB's status.  J.A.0376.  Following a defense objection, the court permitted government counsel to inquire "if [h]e can testify as to anything that Mr. Smith affirmatively said along those lines."  J.A.0377.  The government—presumably knowing that Mr. Eldredge would answer that question in the negative—declined to ask the court's question but instead moved on.  J.A.0377.  And Mr. Eldredge confirmed on cross-examination that he and Mr.

Smith never had any further discussion of the May 14th email, the ABA article, or whether SDB was or was not a WOSB.  J.A.0423-24; 0493-94.

**F.  Mr. Smith's consistent communications made to or intended for outside third parties—including U.S. prime contractors—that Mr. Myers controlled SDB**

If the May 14th email exchange did not make clear that Mr. Smith did not understand that a woman had to control as well as own a WOSB, the statements he subsequently—and consistently—prepared and made to third parties made clear that, in fact, he did not.

### 1.  *The May 30, 2014 business plan*

On May 30, 2014—two weeks after the May 14th email exchange—Mr. Smith emailed Mr. Myers and Mr. Eldredge a business plan for SDB.  J.A.1942. In a new addition from a prior version circulated on April 15, 2014 (J.A.1897), this version stated, "Since the passing of our business founder, *Mike Myers has taken control of USA and SDB. . ."*  J.A.1945 (emphasis added).[7]

Mr. Eldredge acknowledged at trial that someone who understood the two-part WOSB definition would not have written in a business plan that Mr. Myers was "in control" of SDB.

Q:  [Y]ou read the ABA article.  Right?

A:  Yes, I did.

---

[7] USA was a related company also owned by Michael Myers.  SDB paid USA a monthly management fee.

Q:  A woman ha[s] to control.  Right?

A:  Yes.

Q:  And this [business plan] says right here that Mike Myers has taken control of USA and SDB.  Right?

A:  Yes.

Q:  Okay.  And if that was true, and you understand that, then . . . you can't say you're a woman owned small business if that's true.  Right?

A:  Because you're saying Mike Myers has taken control of SDB and therefore they're not a woman owned small business?

Q:  Right.

A:  Yes.

Q:  So you wouldn't write this and also say you're a women-owned small business based on the 51 percent share ownership in the same document, in the same paragraph if you understand that those are completely inconsistent with each other.  Right?

A:  I wouldn't, no.

J.A.0546-47.

### 2.      *Mr. Smith's June 4, 2014, meeting with Patricia Overway*

The government called Patricia Overway, a government contracting specialist with the South Florida Small Business Development Council.  Ms. Overway testified regarding a short meeting she had with Mr. Smith on June 4, 2014, and their follow-up to that meeting.

14

Ms. Overway testified that, after meeting Mr. Smith briefly in April 2014 at a networking event, they met again in person on June 4th to discuss business development opportunities for SDB. J.A.0709-12. Ms. Overway acknowledged that Mr. Smith brought a copy of his May 30th business plan to this meeting, which paradoxically represented both that SDB was a woman-owned small business and that Mike Myers was in control of SDB. J.A.0739-40; 1945. According to her testimony, during the June 4th meeting, Mr. Smith told Ms. Overway that the woman owner of SDB (Ms. Robins) lived out-of-state and "was not actively engaged in the business of SDB." J.A.0712.[8] Ms. Overway also testified that she discussed with Mr. Smith the rules that governed the woman-owned small business program. J.A.0713. Ms. Overway did not testify that she ever told Mr. Smith that SDB was not a WOSB or that SDB needed to correct any of its certifications.

When asked by counsel for the government "whether Mr. Smith verbalized anything about his understanding" of these rules at the June 4th meeting, Ms. Overway said, "No, I don't recall." J.A.0714. She also acknowledged during

---

[8] Government counsel mischaracterized Mr. Smith's conversation with Ms. Overway in its opening statement when telling the jury that Mr. Smith confessed that SDB "did not qualify" as a woman-owned small business. J.A.0089. During her pretrial interviews with law enforcement and trial testimony, Ms. Overway testified that Mr. Smith told her that Anne Robins had become less engaged over time—not that SDB "did not qualify" as a WOSB. J.A.0712; 1398.

cross examination that the emails she sent to Mr. Smith summarizing their meeting and next steps did not mention anything about the WOSB issue. J.A.0758.

Ms. Overway's trial testimony differed significantly from what she told law enforcement officers during their first interview on February 4, 2020. During this initial interview, Ms. Overway said she "did not recall Smith talking about or mentioning the woman owner of SDB during their June 4, 2014, face-to-face meeting, or in any other discussion after that." J.A.1453. Additionally, Ms. Overway could not remember whether she and Mr. Smith had ever discussed the WOSB rules at all. J.A.0721-22. After the interviewing agents showed Ms. Overway documents she had no personal knowledge of for the clear purpose of swaying her opinion against Mr. Smith,[9] Ms. Overway's outlook changed. After seeing these documents, Ms. Overway concluded SDB was not a legitimate WOSB and that Mr. Smith "knew they didn't qualify as a WOSB." J.A.1455.

Ms. Overway and Mr. Smith exchanged several emails in the days that followed their meeting which made clear that she did not view SDB's WOSB

---

[9] The agents showed Ms. Overway Ms. Robins's April 2013 resignation letter from SDB, J.A.1886, her August 19, 2014, letter resigning from the board of directors, J.A.2078, and the May 14th email chain. J.A.1939-41. The agents declined to tell Ms. Overway, however, that there was no evidence Mr. Smith had seen Ms. Robins's resignation letters. They also failed to tell her material information about the May 14th email, including that Mr. Smith had been repeatedly told by Mr. Myers that SDB could self-certify as a WOSB based on Ms. Robins's majority ownership alone.

status as a concern or as warranting follow-up with Mr. Smith.  The same day as the meeting, Ms. Overway sent Mr. Smith an email summarizing their conversation.  J.A.1967.  While the email included a single attachment (among many others, on a variety of different subjects) that highlighted the WOSB rules,[10] the email itself did not mention *any* issue with respect to SDB's woman-owned status, much less advise Mr. Smith that SDB needed to stop representing itself as a WOSB.  J.A.1967.  Ms. Overway emailed Mr. Smith twice more in the days that followed, again never mentioning anything about SDB's woman-owned status.  J.A.0751; 2011; 2167.

### 3.    *The capabilities statement*

At both the June 4th meeting and in her emails, Ms. Overway urged Mr. Smith to prepare a "capabilities statement" for prime contractors.  On June 9, 2014, five days after their June 4th meeting, Mr. Smith emailed a draft capabilities

---

[10] The government incorrectly told the jury during closing argument that Ms. Overway had highlighted the WOSB rules specifically for Mr. Smith.  J.A.1286 (telling jury that Ms. Overway "had highlighted for him the very definition that makes it clear that SDB was a scam.").  That Ms. Overway had highlighted the rules specially "for" Mr. Smith was inaccurate.  J.A.0728 (Ms. Overway testifying that attachment was pre-highlighted before and not specifically for Mr. Smith); J.A.0747 (same).  This was a significant misrepresentation, as that single attachment was the only contemporaneous support for Ms. Overway's testimony that SDB's WOSB status was ever discussed.  Indeed, as noted, Ms. Overway had not recalled any such discussion when first approached by the government.  And because this mischaracterization of the evidence was made in rebuttal argument, defense counsel had no opportunity to correct it.

statement to Ms. Overway.  J.A.2009.  At the top center of the document, it stated, "Founded in 1994, SDB Engineers & Constructors, *a small woman-owned business* located in Titusville, Florida."  J.A.2009 (emphasis added).  The subject of Mr. Smith's email to Ms. Overway was "SDB capabilities document *for your review and input*."  J.A.2009 (emphasis added).  Mr. Smith's email sending the statement further stated, "Your input would be appreciated."  J.A.2009.  Notwithstanding this request, Ms. Overway never responded with any concern regarding the capabilities statement or its WOSB representation.

On June 10, 2014, Mr. Smith emailed the capabilities statement to Mr. Myers, Mr. Eldredge, and an SDB consultant named Dik Getz.  J.A.2012.  Though the May 14th email exchange had taken place just a few weeks earlier, Mr. Eldredge paid no attention to the "Woman Owned Small Business" statements contained in the capabilities statement.  J.A.0549.  He instead focused on the "competencies" section and whether it adequately marketed SDB's services.  J.A.0549.  Mr. Eldredge's testimony on the capabilities statement underscored how insignificant the discussion in the May 14th email was to him.  J.A.0549.

> ### 4.   Mr. Smith's revisions to SDB's website—and Mr. Myers's continued efforts to deceive him

On July 25, 2014, more than two months after the May 14th email and more than a month after Mr. Smith's June 4 meeting with Ms. Overway, Mr. Smith sent Mr. Myers and SDB's web designer an email with draft copy for the revised SDB

website for Mr. Myers's "review and input before forwarding to [SDB's] web developers." J.A.2035. In his email, Mr. Smith proposed a history of SDB *for its public website* that stated, "Following the passing of our beloved business founder, *Mike Myers has taken control of USA Inc. and SDB Inc*." J.A. 2035 (emphasis added). Once again, the government offered no explanation for why Mr. Smith would propose a public statement that Mike Myers controlled SDB on the company's website—which was targeted at their customers, the prime contractors—if he understood that a woman must control the company to legally certify as a WOSB.

In response, Mr. Myers suggested several modifications to Mr. Smith's proposed copy, noting, "I'm not sure how to word Anne's retirement. Any thoughts as she *will remain* a stake holder and most likely continue to sit on the board?" J.A.2035 (emphasis added). In fact, Anne Robins had retired from SDB in April 2013, and—under the sale package Mr. Myers was less than three weeks from consummating with Ms. Robins—would neither remain on SDB's board nor be a "stake holder."

**G.    Mr. Smith's certification of SDB as a woman-owned small business in the System for Award Management after meeting with Anne Robins at USA headquarters**

On July 8, 2014, Mr. Smith visited USA's headquarters in Colwyn, Pennsylvania.[11]  Prior to his visit, Mr. Myers had specifically emailed Ms. Robins—who had retired in April 2013—about being present in the office that day, without copying Mr. Smith.  J.A.1788.  At the meeting, the conversation between Mr. Smith and Ms. Robins at the meeting was brief, unremarkable, and not probative of any issue in the case except for what, based on both Ms. Robins's and Mr. Smith's testimony, it did *not* include—Anne Robins telling Mr. Smith that she had retired.

The next day, Mr. Smith completed a lengthy form on behalf of SDB in the System for Award Management ("SAM"), a government-operated database for federal contractors and subcontractors.  J.A.2013-34.[12]  Of the many

---

[11] As noted, USA was an affiliated company, also owned by Michael Myers.

[12] The SAM form Mr. Smith completed was a 22-page form that solicited numerous representations and certifications from businesses that were seeking federal contracts, grants, or loans.  J.A.2013-34.  The form sought certifications on a wide range of topics, including that the prices being offered were independently determined, no federal funds were used to influence a federal employee, the business had not been declared ineligible to be awarded a federal contract, and that the company would not engage in restricted business practices with certain specific countries.  J.A.2013; 2015; 2019.  Examples of other representations the SAM form requested related to child labor, whether the business was an inverted domestic corporation, the filing of certain compliance reports, and identifications regarding the North American Industry Classification System (NAICS) Codes.  J.A.2015;

representations Mr. Smith made on the form, one was to certify SDB as a woman-owned small business. Mr. Smith's certification was consistent with two decades of prior certifications others had made on SDB's behalf; what Mike Myers, John Albert, and others had told Mr. Smith about SDB's WOSB status; and with the materials representing SDB as a WOSB that Mr. Smith had sent to Giff Eldredge, Patricia Overway, and others.

### H. The sale of Ms. Robins's ownership interest and Mr. Myers's concealment of the sale from Mr. Smith and other SDB employees as they were preparing a bid for Jacobs Technology

Mr. Myers purchased Ms. Robins's 51 percent ownership interest on August 19, 2014. J.A.1793. The same day, Ms. Robins signed a letter resigning from SDB's Board of Directors. J.A.2078.

Just a few days earlier, Mr. Smith and others at SDB had prepared and submitted a subcontract bid to Jacobs Technology ("Jacobs"), a U.S. prime contractor. That bid was prepared in the same way SDB's past bids had been prepared over the 20-year life of the company, including with the representation that the company was a woman-owned small business. J.A.2069-70; 2072.

Mr. Smith's signatures (which were a combination of electronic and wet signatures) appear 23 times in the Jacobs bid paperwork, including on the two

---

2017; 2020-21; 2024. The form provided definitions for several terms, including "inverted domestic corporation," "forced or indentured child labor," "sensitive technology," and "small business concern." J.A.2016.

pages containing WOSB representations. J.A.2036-77. A task list for the contract stated that another employee, Sabrina Kidd, was in fact the employee responsible for preparing those documents—not Mr. Smith. J.A.1016-17; 1798.

SDB finalized the Jacobs bid on August 14, 2014, and SDB found out the next day that it would likely win the bid. J.A.1024. Mr. Smith sent Mr. Myers an email the same day telling him that SDB had won the bid. J.A. 1884. Although Mr. Myers was on the verge of finalizing his purchase of Ms. Robins's ownership stake in SDB, there was no evidence that he or anyone else informed Mr. Smith. Mr. Smith testified that, had Mr. Myers told him that Ms. Robins was about to sell her shares to Mr. Myers, he would have notified Jacobs that SDB was no longer woman-owned. J.A.1030.

The evidence showed that Mr. Myers affirmatively concealed his purchase of Ms. Robins's shares from Mr. Smith. On August 19th—the day of the sale— Mr. Smith emailed Mr. Myers, Mr. Eldredge, and Mr. Albert regarding equipment that SDB would need to perform on the Jacobs contract. J.A.1792. Instead of responding to Mr. Smith, Mr. Myers forwarded the email to Mr. Eldredge, ***removing Mr. Smith and Mr. Albert from his response***. Mr. Myers informed Mr. Eldredge that the sale of Ms. Robins's shares had been consummated with a payment to her of $115,000. J.A.1792; 2079 (check to Ms. Robins). Mr. Myers wrote:

> Please work this out with Kevin and spread costs out over three years if possible.  If not possible what will be the total outlay of cash and its impact on our bank account.  *SDB was drained of 115,000 today for biz transfer.  Deal is done.*

J.A.1792 (emphasis added).  Unlike with Mr. Eldredge, there was no evidence that Mr. Myers, at any time in 2014, told Mr. Smith about the ownership transfer.

### I.    Mr. Myers continues to mislead Mr. Smith regarding Ms. Robins's role and the WOSB issue

Mr. Smith testified that he was not aware that Mr. Myers had sold his shares to Ms. Robins until Mr. Myers first told him about the sale in 2015.  J.A.1028.  The evidence at trial not only supported Mr. Smith's testimony in this regard, it showed that Mr. Myers continued to mislead Mr. Smith regarding Ms. Robins's role at the company and SDB's WOSB status throughout 2014 and into 2015.

In January 2015, five months after Mr. Myers purchased Ms. Robins's ownership interest in SDB and she resigned from SDB's board of directors, yet another email exchange underscored Mr. Myers's dishonesty with Mr. Smith regarding SDB's woman-owned status.  In discussing how to characterize Ms. Robins's role on SDB's website, Mr. Myers instructed Mr. Smith and Ms. Kidd, "We should have Bio's [on SDB's website] for myself, Mark, Giff and Anne.  *Anne should be presented as a Board member with a financial stake in the companies* [sic] *success*."  J.A.1806 (emphasis added).  Of course, unbeknownst to Mr. Smith, but as Mr. Myers well knew, Anne Robins *had resigned* from the board

23

as part of the sale of her 51 percent ownership interest to Mr. Myers back in August 2014 and no longer had "a financial stake in" SDB's success.

The evidence showed that, upon learning of the ownership transfer in 2015, Mr. Smith ceased to represent SDB as a WOSB and changed that representation in every place it appeared.  J.A.1822; 2099; 2130.  That included in SDB's capabilities brochure and the capabilities statement, J.A.1044; 2130, as well as Smith de-certifying SDB as a WOSB in the System for Award Management. J.A.1039; 2112.

### J.    Mr. Smith's interviews with law enforcement and Mr. Myers's attempt to obstruct justice

Finally, upon being interviewed by law enforcement in July and November, 2016, after he had left SDB, Mr. Smith told the case agents the same thing he told the jury:  that he had believed in good faith that SDB could self-certify itself as a WOSB based on Ms. Robins's 51 percent ownership.  J.A.1060-64.

In the meantime, Mr. Myers launched a coordinated effort to obstruct the government's investigation.  On July 7, 2016, the same day NASA OIG executed search warrants at SDB and USA, Mr. Myers submitted to an interview with NASA's Office of Inspector General, during which he lied extensively about SDB's woman-owned status.  J.A.0101.  He also left a voice mail for Ms. Robins—who herself had signed a false affidavit for the OIG agents—urging her to represent that "we did things the way we should have."  J.A.0293-94.  While

circling up with his brother (and co-owner), Mark Myers, Mr. Eldredge and Ms.
Robins, J.A.0596-97, at no point did Mr. Myers attempt to contact Mr. Smith—his
supposed co-conspirator—during his effort to obstruct the government's
investigation.

## II.    THE ADMISSION OF MR. ELDREDGE'S STATEMENT OF FACTS.

Given its unwillingness to call Mr. Myers, a cooperating witness and Mr.
Smith's sole alleged co-conspirator, to the stand, the government's main witness at
trial became SDB COO Giff Eldredge.  Mr. Eldredge, too, had entered into a plea
agreement in which the government agreed to seek a reduced sentence based on his
cooperation.  J.A.0338.  At the outset of his direct examination, Mr. Eldredge
testified that he had agreed to take steps to conceal and "to further" a fraudulent
scheme by Mr. Myers and Mr. Smith to hold SDB out as "a woman-owned small
business for purposes of acquiring contracts, federal contracts, as a subcontractor
to a prime contractor servicing Kennedy Space Center in Florida."  J.A.0336.

After testifying to the above legal conclusion, Mr. Eldredge did little to
incriminate Mr. Smith.  He presented essentially no testimony on the critical issue:
whether Mr. Smith understood that SDB was not a WOSB because it was not
controlled by a woman.  To the contrary, Mr. Eldredge confirmed that he never
heard Mr. Smith say anything indicating an understanding that certifying SDB as a
WOSB was fraudulent.  J.A.0423-24; 0493-94.  And, as noted above, when the

court instructed the government to rephrase an improper question and ask Mr.

Eldredge whether Mr. Smith made any affirmative statements indicating an

agreement to commit fraud, the government simply moved on.  J.A.0377.

Due to the relatively favorable character of his testimony, the defense did

not impeach Mr. Eldredge with any prior statements on cross-examination.  He

was instead asked to clarify some of the answers he had given on direct.  On direct

exam, Mr. Eldredge testified that he had pled to "a felony."  J.A.0337.  On cross-

examination, the defense elicited that Mr. Eldredge had pled guilty to misprision of

a felony—not to conspiring with anyone to commit fraud, including Mr. Smith,

J.A.0428-29, and that he did not in fact commit either fraud or conspiracy to

commit fraud.  J.A.0431.  Mr. Eldredge also testified that, even after the May 14th

"thin ice" email—which, according to Mr. Eldredge, was never discussed again—

he did not believe he was committing a crime.  J.A.0489.

At the beginning of its re-direct exam, the government sought to introduce

the signed statement of facts from Mr. Eldredge's plea agreement and to have Mr.

Eldredge testify about it.  J.A.0600.  The statement of facts appears to have been

signed on June 26, 2019, the same day as Mr. Eldredge's cooperation agreement

with the government.  JA.2146.  Defense counsel objected to the introduction of

the statement on hearsay grounds; a bench conference followed.  J.A.0600-01.

During the bench conference, government counsel argued that the statement of

facts contained prior consistent statements under Fed. R. Evid. 801(d)(1)(B) because statements may be admitted under the rule, according to the government, "if the declarant testifies and is subject to cross-examination." J.A.0601. This was misleading; in quoting Rule 801(d)(1)(B) to the court, government counsel omitted the requirement that the cross examination be "about a prior statement."[13] Fed. R. Evid. 801(d)(1)(B).

Notwithstanding the defense's repeated objections, the court admitted the first two paragraphs of the statement of facts. J.A.0603. Although its reasoning was not entirely clear, the court indicated that it would allow those specific portions to be introduced because "it's a prior statement . . . that rebuts the impression that [Mr. Eldredge] minimized his involvement on cross." J.A.603-04.

Whereas Mr. Eldredge's testimony up to that point had been favorable for Mr. Smith, the admitted paragraphs of the statement of facts contained lengthy incriminating statements—statements that had been drafted by the government and were stated in the form of legal conclusions—regarding Mr. Smith's commission

---

[13] Government counsel told the court:

> Rule 801(d)(1)(B) says it is admissible, "if the declarant testifies and is subject to cross-examination, and the prior statement is consistent with the current testimony and offered either to rebut a charge of recent fabrication or improper motive or rehabilitate the witness's credibility when attacked on other grounds."

J.A.0601. In fact, the Rule states "…and is subject to cross-examination *about a prior statement*…" (emphasis added). Fed. R. Evid. 801(d)(1)(B).

of conspiracy and wire fraud.  In terms of their incriminating nature, these statements went far beyond the testimony Mr. Eldredge had provided on direct examination.  Whereas on direct Mr. Eldredge had said only that SDB, and specifically Mr. Myers and Mr. Smith, "purported to be a woman-owned small business for purposes of acquiring . . . federal contracts as a subcontractor to a prime contractor servicing Kennedy Space Center," J.A.0336, Paragraphs 1 and 2 of Mr. Eldredge's statement of facts contained the legal and factual conclusions that:

(1) Mr. Eldredge had known of "an actual commission of a felony . . . namely, conspiracy to commit wire fraud, major government fraud, false statements, falsification of records, and to defraud the United States," J.A.2147;

(2) "from at least May 2014 through at least July 2016," Mr. Eldredge "knew" that Mr. Smith, with Mr. Myers, had "conspired with each other and others to defraud [Jacobs Technology] . . . and in turn NASA and other components of the U.S. government," J.A.2147-48;

(3) Mr. Smith, with Mr. Myers, had "fraudulently represent[ed] to [Jacobs Technology], the U.S. government (including NASA), and others that [SDB] . . . was a woman-owned small business," J.A.2148;

(4) Mr. Smith, with Mr. Myers, had "fraudulently represented to [Jacobs], the U.S. government (including NASA), and others that [Ms. Robins] . . . owned

28

and controlled [SDB] on a day-to-day basis, when in fact [Ms. Robins] did not do so and had fully retired from [SDB] in or about April 2013[.]"  J.A.2148.

All of the above was then read to the jury by government counsel and Mr. Eldredge in leading fashion (over defense objection).  J.A.0604-08.  The statements were expressly offered as substantive evidence, *i.e.*, for the truth of the matters asserted therein.  J.A.0606-07 (government counsel reading statements from statement of facts and asking, "did you sign that this statement is accurate?"; "was that all true?"; "And did you sign this with regard to Mr. Smith's name because that's in fact what happened?").

The government also elicited from Mr. Eldredge that the statements were made at a time "before you knew that there was going to be any trial," and "before you ever met with the government to prepare for any testimony on this."  J.A.0605. In fact, Mr. Eldredge had debriefed with the government at least two times before signing the statement of facts, J.A.0425 (reflecting two prior debriefings in March of 2019, prior to signing of cooperation agreement), and always knew it was a possibility Mr. Smith would have a trial where he would be a government witness. Notwithstanding the misleading nature of government counsel's exchange with Mr. Eldredge and the false impression this must have left on the jury, there was no opportunity for re-cross-examination to correct the record.

29

## III.    THE POST-TRIAL PROCEEDINGS.

Following trial, Mr. Smith filed motions for judgment of acquittal and for a new trial, including on the basis that the court had improperly admitted Mr. Eldredge's statement of facts and the accompanying testimony.  J.A. 1392-93; 1575-84.  Whereas the government had argued at trial that the paragraphs from the statement of facts were admissible as prior consistent statements under Rule 801(d)(1)(B), it largely abandoned its Rule 801 argument in post-trial briefing, recognizing that "Rule 801(d)(1)(B) is likely not even implicated at all."  J.A.1535. The government argued instead that the statements were admissible under the "rule of completeness."  J.A.1535-38.

In its Order, the court held that the testimony and evidence regarding the statement of facts were "properly admitted to rehabilitate Eldredge."  J.A.1760. On Mr. Smith's motion for a judgment of acquittal, the court reviewed the evidence and held that it, when "viewed most favorably to the Government, clearly constitute[s] substantial evidence upon which a rational[] jury could conclude Defendant's guilt beyond a reasonable doubt on all Counts of conviction, even in the face of the other evidence from which it might have inferred innocence." J.A.1754.

## SUMMARY OF ARGUMENT

I.     Mr. Smith's convictions should be vacated because of the district court's erroneous admission of prejudicial hearsay during the testimony of the government's central witness, H. Gifford ("Giff") Eldredge.

II.     Mr. Smith's convictions should be vacated because the evidence was insufficient to establish his criminal intent, an element of each offense for which Mr. Smith was convicted.

## STANDARD OF REVIEW

Decisions whether to admit evidence over objection are reviewed for abuse of discretion, but legal conclusions underlying such rulings are reviewed *de novo*. *United States v. Landersman*, 886 F.3d 393, 413 (4th Cir. 2018).

This Court reviews *de novo* a district court's denial of a motion for judgment of acquittal, *United States v. Zelaya*, 908 F.3d 920, 925 (4th Cir. 2018), and the underlying verdicts for substantial evidence. *United States v. Burfoot*, 899 F.3d 326, 334 (4th Cir. 2018).

# ARGUMENT

## I. THE COURT SHOULD ORDER A NEW TRIAL BASED ON THE ERRONEOUS ADMISSION OF MR. ELDREDGE'S HIGHLY PREJUDICIAL STATEMENT OF FACTS.

Paragraphs 1 and 2 of Mr. Eldredge's statement of facts—which contained highly damaging representations regarding Mr. Smith—were impermissible hearsay and should not have been admitted. They were not "prior consistent statements" under Rule 801(d)(1)(B).[14] Nor were they admissible, as the government would contend after trial, under the "rule of completeness." Not only did they pronounce Mr. Smith's guilt in conclusory statements of law, their admission also was particularly prejudicial, given the weaknesses in the government's case and the vast majority of Mr. Eldredge's testimony, which was not unfavorable to Mr. Smith. The error and prejudice are both clear and require a new trial.

### A. The admission of Paragraphs 1 and 2 from Mr. Eldredge's statement of facts violated Federal Rule of Evidence 801.

Under Federal Rule of Evidence 801(d)(1)(B)(i), a prior consistent statement is only admissible where it was (1) the subject of cross-examination; and (2) made

---

[14] Rule 801(d)(1)(B) states that a declarant's prior consistent statement is admissible "if the declarant testifies and is subject to cross-examination about a prior statement, and the statement is consistent with the declarant's testimony and is offered: (i) to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or (ii) to rehabilitate the declarant's credibility as a witness when attacked on another ground."

prior to a witness's having a motive to fabricate. *See* Rule 801(d)(1)(B)(i); *see also Tome v. United States*, 513 U.S. 150, 157 (1995); *United States v. Henderson*, 717 F.2d 135, 138 (4th Cir. 1983). Otherwise, it is hearsay and excluded under Rule 802. *See* Fed. R. Evid. 801(a); 802. Paragraphs 1 and 2 of the statement of facts did not meet either of Rule 801(d)(1)(B)'s requirements, and their admission over Mr. Smith's hearsay objection was a clear abuse of discretion.

1.    ***The defense did not cross-examine Mr. Eldredge regarding statements from his statement of facts—or any other prior statements.***

First—contrary to what the government told the trial court—Rule 801(d)(1)(B) applies only when "[t]he declarant testifies and is subject to cross-examination *about a prior statement*." Fed. R. Evid. 801(d) (emphasis added).[15] The government told the trial court that it was offering Mr. Eldredge's statement of facts "to rehabilitate that his story has not changed over time." J.A.0602. But the defense had not contended that Mr. Eldredge's story had changed over time. The defense had not cross-examined Mr. Eldredge about any prior inconsistent statements at all, including any statements from the statement of facts. *See United States v. Lowe,* 65 F.3d 1137, 1144 (4th Cir. 1995) (required under rule that "the

---

[15] As noted above, when government counsel explained Rule 801(d)(1)(B) to the trial court at the bench conference, he said prior consistent statements may be admitted under the rule "'if the declarant testifies and is subject to cross-examination.'" J.A.0601. The "about a prior statement" language was omitted from the government's quotation of the rule.

testimony sought to be bolstered has first been impeached") (quotation omitted).

Because Mr. Eldredge's trial testimony had been relatively favorable to Mr.

Smith—particularly given that he was the government's chief witness—there had

been no need to do so. Thus, because Mr. Eldredge was not cross-examined about

any statements, from his statement of facts or otherwise, there was no basis for

admitting portions of the statement under Rule 801(d)(1)(B).

> **2.    *Mr. Eldredge adopted the statement of facts at a time when he had a motive to fabricate—a fact the defense had no opportunity to cross-examine him about.***

Any prior consistent statement admitted pursuant to Rule 801(d)(1)(B) must

have been made prior to the witness having a motive to fabricate. *See, e.g.,*

*Henderson*, 717 F.2d at 138 ("[W]e have accepted the gloss on Federal Rule of

Evidence 801(d)(1)(B) that a prior consistent statement is admissible only if the

statement was made prior to the time the supposed motive to falsify arose.");

*United States v. Weil*, 561 F.2d 1109, 1111 n.2 (4th Cir. 1977). In *Tome*, 513 U.S.

at 157, the Supreme Court recognized that the rule is meant to prevent cumulative

evidence and "reinforce the significance of the requirement that the consistent

statements must have been made before the alleged influence, or motive to

fabricate, arose." *Id.* at 158; Floralynn Einesman, *Using Prior Consistent*

*Statements to Rehabilitate Credibility or to Prove Substantive Assertions Before*

*and After the 2014 Amendment of Federal Rule of Evidence 801(d)(1)(B)*, 41 Am.

J. Trial Advoc. 1 (2017) ("Under these rules, the time at which the declarant made the consistent statement, and her reason for making it are critical.").

Here, the hearsay statements in Mr. Eldredge's SOF were "adopted" by Mr. Eldredge when he signed a cooperation agreement with the government—a time when a witness's motive to fabricate is at its apogee. Among other incentives to curry favor with the government, his plea agreement included a provision for a sentencing reduction based on U.S.S.G. § 5K1.1, J.A.2135 (Plea Agreement) at 8, which provides for a government motion for a downward departure from the sentencing guidelines where "the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense."

This Court has already recognized the common-sense proposition that a motive to fabricate exists at the time a witness signs a plea agreement, particularly one providing for cooperation. *See, e.g., Ellis*, 121 F.3d at 921 (noting that "a witness's statement made after arrest *but before the signing of a plea agreement* might qualify as 'not hearsay' [under Rule 801]" (emphasis added)); *Henderson*, 717 F.2d at 139 (rejecting appellant's Rule 801 argument as it "would render superfluous our distinction in *Weil* between statements made to police after arrest but before a bargain and statements made after an agreement is reached"); *Weil*, 561 F.2d at 1111 n.2 (finding erroneous admission of prior statement where, *inter*

*alia*, "the statement was not made prior to a bargain between [the witness] and the government as to [the witness's] testimony").

To the extent this Court looks any further (which it need not do), the statement of facts leaves no doubt about whom Mr. Eldredge's cooperation was being sought against. It identifies only two people as individuals Mr. Eldredge knew were conspiring to commit fraud: Mike Myers and Kevin Smith, neither of whom had entered plea agreements with the government at that time. J.A.2147-48. By contrast, it does not identify Ms. Robins as a conspirator, likely for the exact reason that she had already signed a plea agreement with the government. J.A.2147-58; 0246-47. Based on just the statement of facts itself, it was apparent when Mr. Eldredge executed the document he knew that the individuals he would potentially testify against were Mr. Myers and Mr. Smith. Thus, Mr. Eldredge had a motive to fabricate under Rule 801(d)(1)(B) not just generally, but also regarding Mr. Smith's alleged role in the fraud. No part of the statement of facts was admissible as a prior consistent statement.

### B.     The statements were not admissible for rehabilitation under the rule of completeness.

As noted, the government in its post-trial briefing all but abandoned the Rule 801 argument it made at trial, recognizing that, "Rule 801(d)(1)(B) is likely not even implicated at all." J.A,1535. Instead, the government argued for the first time that Mr. Eldredge's statement of facts was admissible under the rule of

completeness.  J.A.1535-38.  The government's belatedly-adopted argument is equally meritless, as the rule of completeness does not apply unless the defense impugns the witness's credibility, which the defense did not do with Mr. Eldredge. Furthermore, the defense did not raise the statement of facts at all on cross-examination, making rehabilitation with portions of that document improper *ab initio*.  The statement of facts also went well beyond Mr. Eldredge's direct exam testimony in incriminating Mr. Smith, which is prohibited under any theory for the admission of a prior consistent statement.  Finally, even if the government's rule of completeness argument had any merit, it would still not address the harm here, as (1) the government expressly used the statement of facts for the prohibited purpose of proving the truth of the matters asserted therein; and (2) the court did not give a limiting instruction.[16]

---

[16] This Court has recognized the possibility that the "pre-motive rule" from Rule 801(d)(1)(B) also applies in circumstances where the statements are admitted for rehabilitation.  *See Ellis*, 121 F.3d at 920 n.16 ("not[ing] without deciding that even were the 'pre-motive rule' to apply, a witness's statement made after arrest but before the signing of a plea agreement might qualify as 'not hearsay' under the rule in this circuit.").  Given the reliability issues pertaining to hearsay statements where the motive to fabricate exists—such as here—the defense respectfully submits that the Court should adopt this position, which is consistent with the Supreme Court's decision in *Tome,* 513 U.S. at 164, but in tension with *Ellis*.  As discussed, admission of Mr. Eldredge's statement of facts plainly did not comply with the pre-motive rule, among the other issues addressed above.

### 1. *The defense never sought to discredit Mr. Eldredge with any prior statement.*

The admission of a prior consistent statement for rule-of-completeness purposes is sometimes permissible when a cross examiner has discredited a witness with a prior inconsistent statement. *See United States* v. *Ellis*, 121 F.3d 908, 919 (4th Cir. 1997) ("'[W]here a cross-examiner has endeavored to discredit a witness by prior inconsistent statements, it is sometimes permissible to offset the damage by showing prior consistent utterances.'") (quoting *Schoppel v. United States*, 270 F.2d 413, 417 (4th Cir. 1959)).

Defense counsel did not discredit Mr. Eldredge with a prior inconsistent statement, let alone one from the statement of facts he had signed. Mr. Eldredge's testimony on cross-examination about his guilty plea was limited to (1) clarifying the offense he pled guilty to, *i.e.*, misprision of a felony; and (2) noting that the offense did not involve conspiring with anyone to commit fraud, including Mr. Smith. Those answers clarified the same testimony Mr. Eldredge had offered on direct examination. Because the defense never attempted to—and did not—impeach or discredit Mr. Eldredge with any prior inconsistent statement, there was no basis for admission of the statement of facts under the rule of completeness.

38

### 2.    *The defense never questioned Mr. Eldredge about his statement of facts.*

In addition to the fact that there was no impeachment of Mr. Eldredge—and thus no basis for introducing evidence to rehabilitate his credibility—it was improper to admit testimony regarding the statement of facts under the rule of completeness as the defense had never even mentioned that document (or any statements from it) on cross-examination.  *See, e.g., Ellis*, 121 F.3d at 921 (rehabilitation permitted with prior consistent statement from FBI 302 interview memorandum where other portions of same document had been used to impeach; "the 'Doctrine of Completeness' operates to ensure that 'when one party has made use *of a portion of a document*, such that misunderstanding or distortion can be averted only through presentation of another portion, the material required for completion is *ipso facto* relevant'") (quoting *Beech Aircraft Corp. v. Rainey.,* 488 U.S. 153, 172 (1988) (emphasis added)); *see also United States v. Awon*, 135 F.3d 96, 101 (1st Cir. 1998) (doctrine of completeness "holds that an otherwise inadmissible recorded statement may be introduced into evidence where one side has made a partial disclosure of the information, and full disclosure would avoid unfairness to the other party").  As the First Circuit set forth in *Awon*, "The doctrine of completeness . . . operates to ensure fairness where a misunderstanding or distortion created by the other party can only be averted by the introduction of

the full text of the out-of-court statement." 135 F.3d at 101 (*citing Ellis*, 121 F.3d at 921).

Here, the defense did not make *any* reference to Mr. Eldredge's statement of facts on cross-examination. Permitting the government to introduce it on redirect for the first time was improper and not allowable under the "rule of completeness."

### 3. *The incriminating statements in the statement of facts went well beyond Mr. Eldredge's testimony from direct examination.*

The admission of the statement of facts was erroneous for the additional reason that it went well beyond Mr. Eldredge's direct examination in incriminating Mr. Smith. This is prohibited under any theory for the admission of prior consistent statements. *See* Laird C. Kirkpatrick and Christopher B. Mueller, *The Dangers of Misinterpreting the Recently Amended FRE 801(d)(1)(B),* 84 Geo. Wash. L. Rev. Arguendo 192, 195-196 (2016) ("An important and well-established common law limitation on the use of prior consistent statements . . . is that they cannot go beyond what the witness testified to at trial."). As a result of its erroneous admission, the jury heard for the first time that, *inter alia*, Mr. Smith was not just allegedly part of a fraud involving the misrepresentation of SDB as a WOSB, but that he was guilty of "an actual commission of a felony . . . namely, conspiracy to commit wire fraud, major government fraud, false statements, falsification of records, and to defraud the United States," J.A.0605-06, and that

those many crimes involved not just a single prime contractor, but also "the U.S. government (including NASA)."  J.A.0606.

### 4. *The rule of completeness does not permit the introduction of prior statements for the truth of the matters asserted therein.*

Any prior consistent statement that is admitted under the rule of completeness may not be used as substantive evidence for the truth of the matter asserted, but instead only to rehabilitate the witness.  *See Ellis*, 121 F.3d at 920 (finding no error in admission of prior statements from FBI 302 under the rule of completeness where statements "were not offered for the truth of the matter asserted"); *see also United States v. Allen*, 69 F. App'x 602, 604 (4th Cir. 2003) (*per curiam*) (citing *Ellis*, 121 F.3d at 919-20).  That plainly was not the case here.  As discussed above, the defense had not attacked Mr. Eldredge's credibility on cross-examination; there was nothing for the government to rehabilitate.  *See United States v. Bolick*, 917 F.2d 135, 138 (4th Cir. 1990) ("As Webster's instructs, to rehabilitate is 'to restore to good repute by vindicating: clear of unjust or unfounded charges: reestablish the good name of.'  *Webster's Third New International Dictionary* 1914 (1976)").  Moreover, when questioning Mr. Eldredge about the statement of facts, the government repeatedly—and expressly—asked Mr. Eldredge if the representations in the statement were "true." J.A.0607 (Q:  "Is that all written there, sir?  A:  Yes it is." . . . Q:  "Was that all

true?  A:  Correct." . . . A:  "And did you sign this with regard to Mr. Smith's name *because that's in fact what happened*?  A.  Yes." (emphasis added)).

Relatedly, because the statement of facts was not admissible for the truth, even if its admission was proper (which it was not), it had to be accompanied by a limiting instruction.  *See Ellis*, 121 F.3d at 920 (finding no error in the admission of prior consistent statements where the statements were "not offered for the truth of the matter asserted" and "the district court properly told the jury to use the prior consistent statements only to assist in determining the credibility of the witness"); *United States v. Chukwuezi*, No. 98-4129, 1999 WL 147934, at *2 n.1 (4th Cir. Mar. 18, 1999) (*per curiam*) (court commenting that because "there was no limiting instruction," the Court would assume the district court applies Rule 801(d)(1)(B) and not the rule-of-completeness standard).  The district court gave no such instruction here because an instruction is unnecessary when admitting prior consistent statements under the only authority relied on by the government at the time of trial, Fed. R. Evid. P. 801(d)(1)(B).  As discussed, when a prior consistent statement is admitted under Rule 801(d)(1)(B), it may "be used as substantive evidence of the truth of the matter asserted."  *Ellis*, 121 F.3d at 919.  Conversely, when a prior consistent statement is introduced for rule-of-completeness purposes, it may be used only "for the limited purpose of rehabilitation," *id*.—which Mr. Eldredge's statement of facts plainly was not.

And, when used for this limited purpose, the trial court must instruct the jury regarding that purpose. *Id*. at 920. Mr. Smith was denied the protection a jury instruction would have served in connection with this highly prejudicial evidence. Thus, even if this Court finds that admission of Mr. Eldredge's statement of facts was proper for rehabilitation, which it was not, and that the statements were not offered for the truth, which they clearly were, a new trial is still required here.

### C. The erroneous admission of the statement of facts was highly prejudicial.

The incorrectly admitted portions of the statement of facts contained highly incriminating and prejudicial statements regarding Mr. Smith. First, the statements were voluminous. Mr. Eldredge's testimony about them comprised a significant portion of the government's re-direct examination, filling five pages of transcript. J.A.0604-08. Thus, as in *Bolick*, where this Court reversed the defendant's conviction for the erroneous admission of such statements, the "amount of out-of-court statements was large." 917 F.2d at 141.

Second, the statements suffered from major reliability issues—issues the jury never got to hear about, due to the government's introduction of the statement of facts on re-direct examination. For one, the assertions in the statement of facts were not even originally uttered by Mr. Eldredge—and not contemporaneously— but rather were drafted by the government several years after the relevant events and "adopted" by Mr. Eldredge when he signed his cooperation agreement.

Furthermore, as discussed above, the statements were adopted at a time when Mr. Eldredge had a strong motive to say whatever the government wanted him to. Worse still, the government misled the jury by acting as if Mr. Eldredge had no inkling when he signed the statement of facts that he might eventually be called upon to testify against Mr. Smith.  J.A.0605-07 (Mr. Eldredge confirming that statements were made "before you knew that there was going to be any trial"; "before you ever met with the government to prepare for any testimony on this"; and "before you knew that there were any charges against Mr. Smith").  In fact, Mr. Eldredge had debriefed with the government at least twice before signing the statement of facts.  J.A.0425-26.  And he always knew, from his cooperation plea agreement and otherwise, that it was a possibility he would cooperate against Mr. Smith at trial—a fact that, due to the absence of re-cross-examination, was never explained to the jury.

Third, the form of the statements read to the jury was improperly prejudicial. The statements read to the jury were not limited to salient facts but rather included general statements about legal culpability couched in legalese, *i.e.*, that Mr. Myers and Mr. Smith "conspired with each other and others to defraud" prime contractors.  J.A.0606.  This was improper and went directly to the legal questions the jury was charged with answering in its verdicts.  *See, e.g., Awon*, 135 F.3d at 101 ("The form in which the material is presented to the jury may affect its weight

if legitimacy, possibly otherwise weak, is thereby attached to the statements."). As in *Bolick*, "'the jury was particularly likely to consider these out-of-court declarations for their truth, for they directly implicated the defendant[] in the specific acts at issue.'" 917 F.2d at 141 (quoting *United States v. Mazza*, 792 F.2d 1210, 1215 (1st Cir. 1986)). Worse still, government counsel elicited the testimony through a series of leading questions, J.A.0604-08, to which the defense objected but was overruled. J.A.0605.

It is difficult to conceive of prior statements that were more improperly prejudicial than those admitted here. Considering that Mr. Eldredge's re-direct comprised the most significant—and lengthy—testimony regarding the alleged conspiratorial agreement between Mr. Smith and Mr. Myers, it is likely that the jury relied heavily on this evidence in rendering its guilty verdicts. The erroneous admission of this testimony was extremely prejudicial and warrants a new trial.

## II.    THE EVIDENCE OF INTENT WAS LEGALLY INSUFFICIENT.

To satisfy the intent element for both conspiracy and wire fraud, the government was required to prove beyond a reasonable doubt that Mr. Smith *knowingly* agreed to misrepresent SDB as a woman-owned small business, and knowingly did the same. J.A.1153-56; 1159-60. The trial reflected a near-total failure by the government to present evidence demonstrating that this intent

45

element was met; it therefore failed to meet its burden with respect to both Count 1 (conspiracy) and Counts 2-7 (wire fraud).

To prove that Mr. Smith knowingly misrepresented SDB as a woman-owned small business, the government needed to establish that Mr. Smith knew and understood the requirement that a woman must not only own, but also control, the company. Not only did the government fail to present sufficient evidence demonstrating his guilt on this element, but the evidence showed precisely the opposite: that Mr. Smith did not understand this requirement largely because his boss, Mr. Myers, consistently misled him regarding SDB's status. The government (1) did not even attempt to refute the overwhelming evidence of Mr. Myers's steady stream of lies to Mr. Smith; (2) essentially did not challenge Mr. Smith's testimony that he genuinely believed SDB was a WOSB until Mr. Myers told him that Ms. Robins had sold her shares, at which point he stopped representing SDB as a WOSB; and (3) until that point, he made repeated representations to third parties—including prime contractors—that Mr. Myers, a man, controlled SDB. This undisputed evidence reflects precisely the kind of "contradictory facts" that render the government's evidence insufficient as a matter of law. *United States v. Bonner*, 648 F.3d 209, 213 (4th Cir. 2011) (judgment of acquittal appropriate where the government's case rested on "missing, flawed, or contradictory facts").

### A. The government never accounted for the overwhelming evidence that Mr. Myers lied to Mr. Smith repeatedly about the WOSB requirements and Ms. Robins's ownership of SDB.

Neither at trial nor even in the post-trial briefing did the government account for the abundant evidence demonstrating that (1) Mr. Myers deceived Mr. Smith regarding the WOSB requirements and Ms. Robins's role at the company; and (2) Mr. Smith believed Mr. Myers's deceptive representations. That evidence included, but was not limited to, the following:

- Mr. Myers's representation to Mr. Smith during his December 2013 interview that SDB was a woman-owned small business until Ms. Robins sold her 51 percent ownership interest, J.A.1887;

- Mr. Myers's initial email on May 14th that SDB could "remain self-certified" by "transition[ing] Anne Robins as president of SDB over the duration of the ownership transfer," J.A.1916—even though Ms. Robins had retired in April 2013, as Mr. Myers well knew;

- Mr. Smith's email to Mr. Myers on July 25, 2014, proposing to promote the fact that Mr. Myers was "in control" of SDB on SDB's public website, and the response from Mr. Myers regarding "how to word Anne's retirement," "as she will remain a key stakeholder and most likely continue to sit on the board." J.A.2035;

47

- The fact that Mr. Myers intentionally removed Mr. Smith from the August 19, 2014, "deal is done" email informing Mr. Eldredge that his purchase of Anne Robins's shares was now complete, J.A.1792;

- The fact that there was no evidence—none—of Mr. Myers (or anyone else) telling Mr. Smith about the August 2014 share purchase until sometime in 2015;

- Mr. Myers's email to Kevin Smith in January 2014 falsely stating that Ms. Robins—who had resigned from the board of directors five months earlier, J.A.2078—was still a "board member with a financial stake in the company's success." J.A.1806.

* * *

The government never addressed Mr. Myers's communications with Mr. Smith on the woman-owned small business issue. Most fundamentally, it did not explain *why* Mr. Myers would continue to represent falsely Ms. Robins's role to Mr. Smith, *if not for the purpose of deceiving him regarding SDB's WOSB status*. Indeed, it did not even call Mr. Myers—the sole convicted co-conspirator—to testify against Mr. Smith at trial. This is precisely the kind of "missing, flawed, or contradictory facts" supporting the conclusion that no reasonable trier of fact could hold Mr. Smith guilty beyond a reasonable doubt. *Bonner*, 648 F.3d at 213.

## B. The government did not meaningfully challenge Mr. Smith's testimony.

For a full day, Mr. Smith testified about every issue in the case, including his review and understanding of the May 14th email exchange, his interactions with Ms. Overway, and his certifications to the government and the prime contractors. J.A.0894-1125. Mr. Smith's testimony—as well as the exhibits in the case generally—were consistent with Mr. Smith's statements from when he was first questioned by federal law enforcement in 2016: that he believed in good faith that SDB could self-certify as a WOSB based on Ms. Robins's 51 percent ownership.

The truthfulness of Mr. Smith's testimony went unchallenged by the government. Instead the government (1) highlighted Mr. Smith's lack of interaction with Ms. Robins, a fact that was irrelevant to Mr. Smith's defense and whether he understood both parts of the WOSB definition; (2) expressed skepticism that anyone might not understand both parts of the definition of a woman-owned business under the FAR, notwithstanding the fact that the government's cooperating witnesses, Ms. Robins and Mr. Eldredge, testified that they similarly believed SDB to be a legitimate WOSB for many years (Robins—approx. 15 years; Eldredge—approx. 1.5 years), despite knowing that Ms. Robins had no role in controlling the company; (3) criticized Mr. Smith for delays in notifying various parties regarding SDB's change in status, even falsely conveying

to the jury that this brief delay—as opposed to any knowing misrepresentation on Mr. Smith's part—was a basis for convicting Mr. Smith of wire fraud.[17]  J.A.1067.

The government did not offer a single exhibit where Mr. Smith expressed a correct understanding of the two-part WOSB definition.[18]  It did not offer any testimony, or any exhibit, where Mr. Smith lied, to anyone, at any time, that Ms. Robins (or any woman) was "in control" of SDB.  The government did not challenge Mr. Smith on his assertion that he was misled by Mr. Myers regarding when he purchased Ms. Robins's 51 percent ownership interest in SDB.  It did not question Mr. Smith regarding his repeated representations, including to third parties including Ms. Overway and for publication on SDB's website, that Mr. Myers, a man, controlled SDB.

The government's strategic choice to limit its cross-examination of Mr. Smith was telling.  It was a recognition that, the more it questioned Mr. Smith

---

[17] This incorrect proposition of law—that any delay in notification constituted fraud—was also prominently featured in the government's closing argument. J.A.1214-15.  Furthermore, both in the government's cross-examination of Mr. Smith and in closing argument, the government falsely suggested that Jacobs did not find out about SDB's change of status until Mr. Smith's October 2015 email exchange with Jacobs Subcontract Administrator Annette Holmes.  J.A.2131; 1076. Among other things, Mr. Smith had changed SDB's status many months earlier in the System for Award Management, J.A.2016, which was the prime contractors' chief source for information regarding a company's status.

[18] The government's two aborted and ineffectual attempts at impeaching Mr. Smith—the "Crane Game" email, J.A.2096, and the PortCanaveral.com email— only underscored Mr. Smith's truthfulness.  J.A.1071-72; 1078-79.

about underlying events, the more apparent it became that Mr. Smith was telling the truth.

### C. The government never accounted for the evidence—including the testimony of its own witness, Patricia Overway—that Mr. Smith consistently communicated to third parties that Mr. Myers controlled SDB.

As discussed above, Mr. Smith made numerous representations to third parties—including in communications he prepared for prime contractors, i.e., entities he was accused of deceiving—that SDB was controlled by a man, Michael Myers.  Ms. Overway's testimony made this abundantly clear.  The fact that Mr. Smith brought her his business plan, highlighting control of SDB by a man, and the fact that he openly told her that Ms. Robins was not engaged at SDB, according to Ms. Overway, supported Mr. Smith's defense that he did not understand the control requirement—even after the May 14th email the government claimed was proof that Mr. Smith knew SDB was not a WOSB.  J.A.0712; 0739-40.

Moreover, the emails Ms. Overway subsequently sent to Mr. Smith did not reflect any concern for (or even discussion of) the WOSB issue.  J.A.1967; 1840; 2011.  And although one of the many attachments Ms. Overway sent to Mr. Smith included highlights over the text of the requirements for woman-owned small businesses, there was no evidence that Mr. Smith read—much less understood— that document.  In direct contradiction to what the prosecutor told the jury in

rebuttal closing argument on this critical issue,[19] that document was a pre-highlighted, standard form that she sent to many others and was not the result of any special effort by Ms. Overway to bring the issue to Mr. Smith's attention. J.A.0727-28.

To the extent there was any question about Mr. Smith's state of mind in the wake of his meeting with Ms. Overway, however, the capabilities statement Mr. Smith sent her just five days later provided a definitive answer. J.A.2009. That document represents, up front and center, that SDB was a woman-owned small business. J.A.2009. There can be no explanation for why Mr. Smith (or any other rational person) would have sent Ms. Overway this document had he understood her to have said that SDB could not legally represent itself as a WOSB.

Just as with the May 30th business plan, the government at no time even attempted to explain how the capabilities statement, with its continued representation of SDB as a WOSB, could possibly be consistent with Mr. Smith's guilt. That is because there is no such explanation; Mr. Smith continued representing SDB as a woman-owned small business in the capabilities statement because he honestly believed—even after the May 14th email and his meeting with Ms. Overway—that SDB could legitimately do so, as he did not interpret Ms.

---

[19] As noted, the government incorrectly told the jury in closing that Ms. Overway had highlighted the attachment "for" Mr. Smith. *See* discussion, *supra*, at 16 n.10.

Overway to have told him otherwise. There is no other explanation for his actions consistent with the evidence.

## CONCLUSION

Mr. Smith's trial was fundamentally flawed. The trial court rescued a misguided prosecution by erroneously admitting highly prejudicial statements from a government-drafted statement of facts that did not qualify for admission under Rule 801(d)(1)(B) or the rule-of-completeness.

Even aside from that, the government did not present substantial evidence of Mr. Smith's guilt of conspiracy and wire fraud because it did not show that he had the requisite intent. Nor did it rebut the strong exculpatory evidence of Mr. Smith's innocence. Contrary to the jury's verdict on Counts 1, 2, and 4-7, the evidence is clear that Mr. Smith acted in good faith and did not commit the charged offenses.

Mr. Smith requests that the Court enter an order directing the trial court to acquit Mr. Smith. In the alternative, the Court should order a new trial based on the erroneous admission of highly prejudicial hearsay.

Dated: August 8, 2022

Respectfully submitted,

_____/s/_____
Jonathan S. Jeffress
Tony W. Miles
Amelia Schmidt
William Zapf
KAISERDILLON PLLC
1099 14th Street NW, 8th Floor
Washington, D.C. 20005
Telephone: (202) 640-2850
Facsimile: (202) 280-1034
jjeffress@kaiserdillon.com

*Counsel for Defendant-Appellant
Kevin Neal Smith*

## STATEMENT REGARDING ORAL ARGUMENT

Under Federal Rule of Appellate Procedure 34(a) and Fourth Circuit Rule 34(a), Appellant respectfully requests that the Court hold oral argument in this appeal. In light of the nature of the issues that have been raised by Appellant, Appellant submits that oral argument would aid the Court in its decisional process.

## CERTIFICATE OF COMPLIANCE

I hereby certify that, pursuant to Fed. R. App. P. 32(g)(1), this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

1.      Exclusive of the portions of the brief exempted by Fed. R. App. P. 32(f), this brief contains 12,375 words.

2.      This brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.  I have relied upon the word count feature of this word processing system in preparing this certificate.

Dated:  August 8, 2022                 /s/ _____
                                       Jonathan S. Jeffress

## CERTIFICATE OF SERVICE

I hereby certify that on August 8, 2022, I will electronically file the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

Dated: August 8, 2022                    /s/ _____
                                         Jonathan S. Jeffress